**Augustus I. CAVALLARI, Jr., Petitioner,**

v.

**OFFICE OF the COMPTROLLER OF THE CURRENCY, and Board of Governors of the Federal Reserve System, Respondents.**

Nos. 1370, 1612, Dockets 94–4151, 94–4183.

United States Court of Appeals, Second Circuit.

Argued March 23, 1995.

Decided May 11, 1995.

---

Chester J. Bukowski, Jr., Hartford, CT (Gordon, Muir & Foley, Peter C. Schwartz, Christopher L. Slack, of counsel), for petitioner.

Yvonne D. McIntire, Washington, DC (Office of the Comptroller of the Currency, Julie L. Williams, L. Robert Griffin, Rosa M. Koppel, Horace G. Sneed, of counsel), and Douglas B. Jordan, Washington, DC (Board of Governors of the Federal Reserve System, James V. Mattingly, Jr., Richard M. Ashton, and Katherine H. Wheatley, of counsel), for respondents.

Before: KEARSE, LUMBARD, and LEVAL, Circuit Judges.

LUMBARD, Circuit Judge:

Augustus I. Cavallari, Jr., petitions for review of a Decision and Order issued by the Comptroller of the Currency on July 28, 1994, and a Decision and Order issued by the Board of Governors of the Federal Reserve System on September 26, 1994. The Comptroller determined that Cavallari was an institution-affiliated party ("IAP") as defined by 12 U.S.C. § 1813(u), and had recklessly disregarded a temporary cease and desist order issued by the Office of the Comptroller of the Currency ("OCC") to Summit National Bank in Torrington, Connecticut. The Comptroller ordered Cavallari to pay restitution of $554,903.83, plus interest, to the Federal Deposit Insurance Corporation ("FDIC") as receiver for the bank, pursuant to 12 U.S.C. § 1818(b); and to pay a civil monetary penalty of $83,000, pursuant to 12 U.S.C. § 1818(i). The Board, for similar reasons, prohibited Cavallari from any further participation in the affairs of any insured depository institution, pursuant to 12 U.S.C. § 1818(e).

On appeal, Cavallari argues that (1) he was not an IAP; (2) he did not recklessly disregard an agency order; (3) the restitution order lacks foundation; (4) the prohibition order lacks foundation; and (5) the agency proceedings deprived him of his constitutional right to a jury trial. We deny the petition in part and remand to the Comptroller to

determine the amount of restitution that Cavallari should make for Summit's losses.

## I.

In September 1987, Richard D. Barbieri, Sr., John A. Corpaci, and Vinal Duncan purchased WQQW, a radio station in Waterbury, Connecticut. They were interested in purchasing another Waterbury station, WWCO, but federal regulations precluded their direct ownership of WWCO. Accordingly, they helped form the Winthrop Broadcasting Corporation to purchase WWCO. Winthrop's six shareholders were all friends or relatives of Barbieri, Corpaci, and Duncan. Barbieri's son, Richard, a 20% shareholder, served as Winthrop's president, while Duncan's son, Douglas, also a 20% shareholder, served as a vice president.

In September 1988, Summit National Bank loaned $600,000 to Winthrop. Winthrop used the funds to purchase WWCO and the 4.5 acre property on which it was located. Winthrop's capital at the time of the loan was only $1,000. The loan was secured by a first mortgage on the WWCO property and by the personal guaranties of five of Winthrop's six shareholders. The guarantors submitted financial statements from 1987–1989 showing a collective net worth in excess of $16,000,000. The 1989 statement of one guarantor, Ralph Carpinella—a vice president of Winthrop and a business partner of Barbieri, Corpaci, and Duncan—showed real estate assets valued at $26 million, and a net worth of roughly $14.3 million. In December 1988, Summit loaned Winthrop an additional $100,000. Although the loan was unsecured, the five guarantors of the original loan signed as co-makers.

In July 1990, Winthrop stopped payment on the two loans, which had outstanding principal balances of $564,357 and $50,000, respectively. In December 1990, Summit wrote to each of the five guarantors, demanding interest past due of over $40,000. Shortly thereafter, Barbieri and Corpaci sought a workout of the two loans on Winthrop's behalf. In January 1991, Summit engaged Cavallari—an attorney whom Summit frequently retained as independent contractor in connection with collections, workouts, and closings—to assist it in the workout of the Winthrop loans.

Barbieri was then under investigation by federal authorities regarding several loans he had obtained at various Connecticut banks. In addition, Summit itself was subject to a temporary order to cease and desist from transacting with Barbieri and his associates. The order, issued by the OCC on July 16, 1990, stated:

> The Bank shall not approve, purchase, grant, make, or fund any loan or other extension of credit, as defined in 12 C.F.R. § 215.3, to any of the following former or current officers or directors of Security Savings and Loan Association, Waterbury, Connecticut, or to their related interests as defined in 12 C.F.R. § 215.2:
>
> (a) Richard D. Barbieri
>
> (b) Vinal S. Duncan
>
> (c) John A. Corpaci
>
> (d) Richard D. Barbieri, Jr.

In connection with the order, the OCC issued a Notice of Charges that, "[c]ontrary to safe and sound banking practices," Summit had extended credit to these persons "without regard for prudent lending principles."

Although Cavallari had not seen the contents of this order, he knew of its existence. Cavallari stated in a deposition: "I knew there was [sic] cease and desist orders, I didn't know what the contents were. I didn't think about it, to tell you the truth." Cavallari also was aware of Barbieri's legal problems. In September 1990, Cavallari had represented Summit in a meeting about certain troubled real estate loans made to Barbieri, Corpaci, and two associates. In his memorandum about that meeting, Cavallari noted that these borrowers were facing "regulatory and criminal problems." In December 1990—one month before Cavallari was retained to assist in the Summit workout—the Office of Thrift Supervision ("OTS") deposed him because of his role in obtaining, secretly on Barbieri's behalf, two substantial real estate loans from Security Savings and Loan. The OTS investigator specifically inquired: "Did a thought ever occur to you that you were perpetrating a fraud on [Security]?"

On February 26, 1991, pursuant to negotiations with Barbieri, Summit released the individual guarantors. In exchange, Summit received a guaranty from Comko, Ltd.—a corporation owned by Barbieri, Corpaci, and Duncan that was the parent corporation of WQQW—and a security interest in Comko's radio equipment. Cavallari, who had drafted the release, orally advised Summit's president, Raymond Cordani, that the release was in Summit's best interest. Cavallari also offered a written opinion, based on his review of Comko's security agreement, guaranty, and financing statement, "that the exchange of guaranties was in the best interest of the bank." Cavallari stated that "the individual guarantors are now subject to a great deal of litigation arising out of loans guaranteed to several other banks," while Comko "has pledged additional security which was not previously available to the bank." Cavallari concluded:

> I feel that given the circumstances, the bank is in a far more secure position now that it has the Comko guaranty than it was when it was secured by the individuals. I feel quite comfortable having this guaranty with its additional security in lieu of the guaranties of the individuals which have been released.

This letter was read into the minutes of the loan committee's meeting, and placed in the Winthrop credit file.

When preparing this letter, Cavallari had assumed that the released guarantors also had provided personal guaranties for other loans that were then the subject of litigation. In fact, the released guarantors had not provided such guaranties. Moreover, Comko itself was not financially sound: its 1990 financial statement showed a net loss of almost $300,000, and a net worth of only $50,000. Cavallari had made no investigation of the guarantors' supposed liability exposure or of Comko's financial condition prior to execution of the release.

Following the exchange of guaranties, Barbieri negotiated a renewal and restructuring of the two Winthrop loans. In exchange, Summit received a first mortgage on land on Watertown Avenue in Waterbury, Connecticut owned by Barbieri, Corpaci, and Duncan.

Cavallari drafted the agreement, which consolidated the loans into a single note and called for repayment over a five year period. After making three payments on the new note, Winthrop again defaulted. In February 1992, the FDIC declared Summit insolvent and took over as receiver.

On June 23, 1992, the OCC issued three Notices of Charges to Cavallari, Barbieri, and Cordani. Barbieri and Cordani entered into settlements with the OCC before the charges were heard.

In July 1993, the Winthrop loans had an outstanding balance of roughly $769,000, consisting of $597,000 in principal and $172,000 in unpaid interest. The OCC appraised the security for the loan as worth about $214,000. The OCC thus sought restitution of $554,903.83, the difference between the loan debt and the value of the security. The OCC also sought to impose a $250,000 civil monetary penalty against Cavallari and to prohibit his participation in further banking activity.

Administrative Law Judge ("ALJ") Walter Alprin, after a hearing held in August 1993, found that (1) Cavallari had participated in the loan renewal and in the exchange of guaranties; (2) Cavallari breached a fiduciary duty to Summit by "recommending the release and renewal without all the facts necessary to make a prudent determination"; (3) the exchange of guaranties was a "novation" that violated the cease and desist order; (4) Cavallari had recklessly engaged in an unsafe or unsound banking practice; and (5) Cavallari had caused a loss to Summit of at least $554,903.83. The ALJ recommended imposing a $30,000 penalty and prohibiting Cavallari from further banking activity, but declined to recommend restitution. Noting that Cordani already had agreed to pay restitution of $75,000 to the FDIC, while Barbieri had agreed pay restitution of $3.1 million to the OTS for actions affecting four Connecticut banks, the ALJ found that these other settlements already may have "made Summit whole" for any loss arising from the Winthrop loans.

The ALJ's Recommended Decision was forwarded to the Comptroller and to the Board. The Comptroller determined that

the evidence showed that Cavallari had "merely drafted" the necessary documents for the loan renewal but did not participate in that decision. Nonetheless, the Comptroller found Cavallari's role in the exchange of guaranties to satisfy the statutory requirements of liability for both restitution and a civil monetary penalty pursuant to 12 U.S.C. § 1818(b) and (i), respectively. The Comptroller ruled that Cavallari should be held liable for the full amount of restitution sought by the OCC, because (1) restitution under the Barbieri settlement was payable to the OTS, not to the individual banks or their receivers, and (2) there was no showing as to whether Cordani's payment was applied to the Winthrop loans or other Summit losses. The Comptroller reduced the OCC's requested penalty of $250,000 by one-half, because the OCC had shown legal misconduct by Cavallari only in connection with the release of the guarantors, not the loan renewal; and he reduced the resulting amount by one-third, because the OCC had shown unsafe or unsound practices and violations of an agency order, but not breach of a fiduciary duty. Accordingly, the Comptroller imposed a penalty of $83,000.

The Board adopted the Comptroller's IAP determination, and the ALJ's conclusions regarding causation of financial loss. The Board issued a prohibition order against Cavallari pursuant to 12 U.S.C. § 1818(e).

## II.

■ Cavallari seeks to set aside all three orders on the ground that he was not an IAP as defined in the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (1989) (codified as amended in scattered sections of 12 U.S.C.). The statutory definition of an IAP includes, in pertinent part, "any independent contractor (including any attorney ...) who knowingly or recklessly participates in ... any unsafe or unsound practice" that causes non-minimal loss to a bank. 12 U.S.C. § 1813(u)(4). Cavallari challenges the finding that he was an IAP on three grounds: (1) he was a mere "scrivener" who drafted agreements according to Summit's instructions, not a participant; (2) he

acted in good faith, not recklessly; and (3) the OCC failed to provide competent evidence as to the standard of care for an attorney providing advice to a financial institution. We disagree.

FIRREA does not define recklessness. The Comptroller relied on authority holding that an act is reckless if done in disregard of, and evidencing conscious indifference to, a known or obvious risk of a substantial harm. *See Simpson v. Office of Thrift Supervision,* 29 F.3d 1418, 1425 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1096, 130 L.Ed.2d 1064 (1995); *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *see also* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 34, at 213 (5th ed. 1984). Nor does FIRREA define an "unsafe or unsound practice." Citing *First National Bank of Eden v. Department of the Treasury,* 568 F.2d 610, 611 n. 2 (8th Cir.1978), the ALJ and the Comptroller defined this term as "conduct deemed contrary to accepted standards of banking operations which might result in abnormal risk or loss to a banking institution or shareholder."

■ The evidence showed that Cavallari did not simply reduce the exchange of guaranties to paper. He also provided oral and written advice that the exchange of guaranties was in Summit's best interests. Cavallari thus "participated" in the transaction. Further, he did not provide the kind of good faith legal advice that FIRREA shields. *See* H.R.Rep. No. 54, 101st Cong., 1st Sess., pt. 1, at 467 (*"Report"*) (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 263 (indicating that good faith advice as to a transaction's legality ordinarily will not incur liability). The evidence showed that Cavallari (1) gave no consideration to whether the exchange of guaranties contravened the terms of the temporary cease and desist order, of whose existence he was aware; (2) made no effort to ascertain the actual liability exposure of the released guarantors or the worth of the Comko guaranties; and (3) was aware that Barbieri—who substituted his own corporation's guaranty for the personal guaranty of friends and family members—was under investigation re-

garding several other allegedly fraudulent transactions. Such evidence supports a finding that Cavallari recklessly asserted that the exchange of guaranties was in Summit's best interest. *See Rolf,* 570 F.2d at 47–48 (finding recklessness where representations are "conclusorily made . . . without investigation and with utter disregard for whether there was a basis for the assertions").

The ALJ, the Comptroller, and the Board further found that the exchange was made contrary to accepted standards for banking operations, and that it was likely to subject Summit to an abnormal risk or loss. With respect to the latter issue, the OCC introduced no testimony by a legal expert regarding the standard of care for a transactional attorney. Instead, the OCC relied chiefly on the testimony of Thomas O'Dea, an experienced bank examiner, who had attended a deposition of Cavallari in December 1991 and had examined Summit's files.

■ Given their own expertise in banking matters, the ALJ, the Comptroller, and the Board required no expert attorney testimony to determine whether, in the circumstances, Cavallari had recklessly participated in an unsafe or unsound banking practice. Furthermore, as Cavallari himself admitted in a deposition, his advice on the exchange of guaranties was a "business opinion" concerning the transaction's soundness rather than a legal opinion on any aspect of the transaction. O'Dea was competent to testify about whether Cavallari had met the standard of care for giving such advice.

### III.

Cavallari seeks to set aside the restitution order, which was issued pursuant to 12 U.S.C. § 1818(b)(6)(A)(ii), on the ground that he did not recklessly disregard the OCC's temporary cease and desist order of July 16, 1990. Cavallari argues that the exchange of guaranties was not an "extension of credit" in violation of the order.

■ When the OCC issues a Notice of Charges against a bank, it also may issue a temporary order requiring the bank to cease and desist from practices that are "likely to cause insolvency or significant dissipation of [its] assets or earnings." 12 U.S.C. § 1818(c)(1). The OCC's July 16, 1990 order directed Summit to make no further "extension of credit" to Barbieri, Corpaci, Duncan, and Barbieri, Jr., or their "related interests." The order stated that the unsafe and unsound practices specified in an accompanying Notice of Charges were "likely to cause insolvency or significant dissipation" of Summit's assets. In turn, the accompanying Notice of Charges stated that Summit had extended credit to these persons and their related interests "without regard for prudent lending principles."

A related interest is "[a] company that is controlled by that person." 12 C.F.R. § 215.2(m). An extension of credit "is a making or renewal of any loan, a granting of a line of credit, or an extending of credit in any manner whatsoever." 12 C.F.R. § 215.3(a). However, it does not include "a guarantee for the protection of a bank of any loan or other asset . . . or . . . any indebtedness to a bank for the purpose of protecting the bank against loss or of giving financial assistance to it." 12 C.F.R. § 215.3(b)(4). Cavallari contends that the exchange of guaranties is shielded by section 215.3(b)(4), and in any event did not fall within section 215.3(a). We disagree.

■ The Comptroller found that the release of the five original guarantors from any further obligation on the Winthrop loans "clearly was not made for the benefit of [Summit]" under section 215.3(b). This finding is amply supported by the Comptroller's prior determination that Cavallari himself had no good faith basis for recommending the exchange as in Summit's best interests, and that the exchange did not in fact benefit Summit.

The Comptroller also ruled that the exchange of guaranties was an extension of credit under section 215.3(a). An agency's reasonable construction of its own regulation is given controlling weight. *See Thomas Jefferson University v. Shalala,* —— U.S. ——, ——, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994). Here, the OCC's temporary cease and desist order expressed a clear intent to halt further imprudent loan practices with

respect to Duncan, Corpaci, both Barbieris, and Winthrop as a "related interest." Yet by releasing the original guarantors, Summit waived its right of recourse against them for loans on which Winthrop had defaulted, and received in exchange Comko's relatively worthless guaranty. The evidence supports the Comptroller's determination that the waiver was an extension of credit, *see Marine Bank Southwest, N.A. v. Hoffman (In re Hoffman)*, 80 B.R. 924, 926–27 (Bankr. N.D.Ill.1988), and that the release thus occurred in violation of the agency order.

### IV.

Cavallari argues that the restitution order was based on inadequate factual findings. The Comptroller, relying on the factual findings of the ALJ, determined that Cavallari's actions caused or were likely to cause a loss of $554,903.83 to Summit, and ordered restitution in that amount plus interest. We do not agree with Cavallari's contention that the loss determination is unsupported by substantial evidence. However, we do agree that the Comptroller did not give due consideration to collateral sources of restitution.

Cavallari challenges the finding that Summit lost $554,903.83. This figure was obtained by subtracting the value of Summit's security from the outstanding $769,000 balance of the Winthrop loans. The security consisted of a first mortgage on the WWCO property, a first mortgage on the Watertown Avenue property, and a security interest in Winthrop and Comko radio equipment. OCC witnesses appraised these real and personal properties as worth $165,000, $1,000, and $48,000, respectively.

Cavallari contends that the ALJ arbitrarily discounted prior appraisals, made in 1990, of $900,000 for the WWCO property and $215,-000 for the Watertown Avenue property; and that he failed to consider the value of the WWCO property as a radio station site, or the value of the Comko equipment if sold as a complete package rather than piecemeal. Yet the OCC witnesses testified in detail about the basis for their appraisals, including the expense of developing either property commercially, the commercial prospects of each site, and the resale value of radio equip-

ment. Moreover, the ALJ specifically noted that Winthrop's own well-documented business failure undermined Cavallari's claim that the WWCO property had unique value as a radio station site. The record thus offers substantial evidence in support of the agency determinations regarding the total loss to Summit from the Winthrop loans.

■ However, because the restitution order against Cavallari is predicated on loss to Summit, the order should not exceed Summit's actual uncompensated loss. *See United States v. Brick*, 905 F.2d 1092, 1099 (7th Cir.1990). The actual uncompensated loss arising from the Winthrop loans is somewhat uncertain, given the OCC's prior settlements with Cordani and Barbieri.

On April 27, 1993, pursuant to a settlement agreement, the OCC issued an order against Barbieri requiring, in part, restitution of $3.1 million "to the OTS or any person or agency designated by the OTS." The restitution order was based on Barbieri's activities in connection with four separate Connecticut banks, including Summit. The order did not allocate the amount of restitution each individual bank was due, nor did it specify the specific loan activities in connection with which restitution was sought. On June 15, 1993, the OCC entered into a settlement agreement with Cordani requiring, in part, payment of $75,000 to the FDIC as receiver for Summit. This order also did not specify the loan activities for which restitution was sought.

The Comptroller ruled that these collateral sources of restitution for the Winthrop loss could not be considered because (1) Barbieri's payment went to the OTS, not the FDIC, and (2) the Cordani order did not specify whether it covered the Winthrop losses or other losses caused by Cordani. We think that this ruling was premature.

The OTS may "designate" what person or agency shall receive restitution from Barbieri. Since Summit is one of the four banks entitled to restitution from Barbieri, it seems likely that the OTS will designate Summit, or the FDIC as Summit's receiver, as one recipient.

Further, this case arose from a Notice of Charges issued jointly against Barbieri, Cordani, and Cavallari. The OCC, therefore, had sufficient familiarity with the charges against Barbieri and Cordani to determine what portion of their respective restitution orders, if any, to allocate to the Winthrop loans. Since the OCC bears the burden of determining the actual loss to Summit arising from the Winthrop loans after taking these payments into account, evidence should have been considered regarding how to apportion the Cordani and Barbieri payments between the Winthrop loss and other bank losses. We therefore vacate the restitution order against Cavallari and remand the case for further proceedings to determine what amount of restitution Cavallari should make.

## V.

■ Cavallari seeks to set aside the prohibition order as unwarranted by the Board's findings. The Board may prohibit an IAP from further participation in banking affairs if he (1) engages in an unsafe or unsound banking practice, (2) causes or is likely to cause loss to a bank, and (3) shows "willful disregard" for the bank's safety or soundness. 12 U.S.C. § 1818(e)(1). The Board found that by recommending the exchange of guaranties, Cavallari engaged in an unsafe or unsound banking practice that caused loss to Summit. Defining willfulness as "deliberately and consciously tak[ing] part in an action that evidences utter lack of attention to an institution's safety and soundness," the Board found Cavallari's conduct to meet this standard because it "evidenced a willingness to turn a blind eye to Summit's interests in the face of known risk." For the reasons we have already stated, we conclude that substantial evidence supports the Board's findings.

## VI.

■ Finally, Cavallari contends that he was deprived of his Seventh Amendment right to a civil jury trial. This right attaches in all cases involving legal rather than equitable claims. *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 41, 109 S.Ct. 2782, 2790, 106 L.Ed.2d 26 (1989). However, when the government sues in its sovereign capacity to enforce "public rights," Congress may assign the factfinding and initial adjudication to an administrative forum. *Atlas Roofing Co. v. Occupational Safety and Health Review Commission,* 430 U.S. 442, 450, 97 S.Ct. 1261, 1266, 51 L.Ed.2d 464 (1977). Cavallari contends that the restitution order and civil monetary penalty are disguised tort awards, *i.e.,* a legal remedy, and that no "public right" is at stake here because the government merely stands in Summit's shoes. We disagree.

■ After several savings and loan associations failed during the 1980's, Congress enacted FIRREA in order to safeguard the thrift industry and the FDIC. *See Report* at 291–312, *reprinted in* 1989 U.S.C.C.A.N. at 87–108. The Notice of Charges brought against Cavallari stemmed from his disregard of an order issued by the OCC pursuant to its regulatory authority under FIRREA. The OCC charges clearly implicate public rights, as distinct from any legal claims against Cavallari that the FDIC as Summit's receiver might bring, *see, e.g., O'Melveny & Myers v. Federal Deposit Insurance Corp.,* —— U.S. ——, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) (FDIC brings state law claims against bank's attorney for professional negligence and breach of fiduciary duty). Therefore, no jury trial was required. *See Simpson,* 29 F.3d at 1422–24; *Akin v. Office of Thrift Supervision,* 950 F.2d 1180, 1186 (5th Cir. 1992); *Paul v. Office of Thrift Supervision,* 763 F.Supp. 568, 573–74 (S.D.Fl.1990), *aff'd,* 948 F.2d 1297 (11th Cir.1991).

We have considered Cavallari's other arguments and find them without merit.

Petition denied in part; the restitution order is vacated and the case is remanded to the Comptroller for further proceedings to determine the amount of restitution that Cavallari should make to Summit.