Opinion for the Court filed by Senior Circuit Judge WILLIAMS.
Opinion concurring in the judgment filed by Circuit Judge HENDERSON.
WILLIAMS, Senior Circuit Judge:
Grant Thornton, LLP, an accounting firm, appeals a final decision and order of the Comptroller of the Currency that requires the firm to pay $300,000 in civil penalties for recklessly failing to meet Generally Accepted Auditing Standards (“GAAS”) in its audit of the First National Bank of Keystone. Grant Thornton also appeals the Comptroller’s cease and desist order mandating that the firm comply with a host of conditions whenever it audits depository institutions. We vacate the final decision and both orders, finding that when an accounting firm merely performs an external audit aimed solely at verifying *1330 the accuracy of a bank’s books, it is not “participat[ing]” or “engaging” in “an unsafe or unsound practice in conducting the business” or “the affairs” of the bank, as those terms are used in 12 U.S.C. §§ 1813(u)(4)(C), 1818(b)(1), and 1818(i)(2)(B)(i)(II).
In 1992 the First National Bank of Keystone, then a small rural bank in West Virginia, sought to increase its revenues, launching an ambitious loan securitization program. The bank bought subprime or high loan-to-value loans from large originators throughout the country. It then pooled these loans with loans it had originated itself. The bank bundled the loans into securities and sold them to institutional investors. Keystone hired asset servi-cers to collect the principal, interest, and penalties on the loans and to issue monthly checks of interest income to Keystone. By 1999 the bank’s assets of approximately $100 million had apparently skyrocketed to about $1 billion.
Examiners from the Office of the Comptroller of Currency (“OCC”) scrutinized the bank’s records periodically from 1992 through 1999. In a 1997 report, the examiners criticized the accuracy of the bank’s statements and the effectiveness of the securitization program’s management. Using a standard rating system, the OCC gave the bank very low marks for its overall condition and management quality.
Because of Keystone’s failure to address these concerns, the OCC initiated an enforcement action against the bank in May 1998. As a result, Keystone and the OCC formally agreed that the bank would retain a nationally recognized independent accounting firm to audit the bank’s mortgage operations, assess the accuracy of its financial statements, and determine the validity of the bank’s accounting for loans it purchased and bundled into securities. In July 1998 the bank hired Grant Thornton to conduct the agreed-upon external audit. In April 1999 Grant Thornton issued its audit opinion. The opinion acknowledged the firm’s duty to “obtain reasonable assurance about whether [Keystone’s] financial statements [for 1997 and 1998] are free of material misstatement,” and in effect stated that it had found such assurance.
In August 1999 OCC examiners uncovered Keystone’s fraud. The bank had inflated its interest income by nearly $98 million and its assets by about $450 million. These $450 million in assets supposedly belonging to Keystone were in reality those of another bank. The scheme masked the fact that Keystone had been insolvent since 1996. Several members of Keystone management were convicted of felonies for falsifying bank financial records, loan servicer reports, and remittances, as well as lying to auditors and regulators. After the OCC determined that Keystone was insolvent, it closed the bank.
On March 5, 2004 the OCC invoked the Financial Institutions Reform, Recovery, and Enforcement Act (“FIRREA”) of 1989, Pub.L. No. 101-73, 103 Stat. 183, and initiated an administrative proceeding claiming that Grant Thornton, in auditing Keystone’s financial statements, had “recklessly engag[ed] in an unsafe or unsound practice in conducting [Keystone’s] affairs.” 12 U.S.C. § 1818(b)(1); see also §§ 1813(u)(4), 1818(i)(2)(B). The government’s evidence showed, among other things, that Grant Thornton had relied on oral representations as to Keystone’s ownership of approximately $236 million of the $450 million at issue, even in the face of written communications suggesting the opposite. At the end of the hearing, however, the administrative law judge recom *1331 mended that all charges be dismissed because she found that Grant Thornton had not acted recklessly.
On December 7, 2006 the Comptroller rejected the ALJ’s recommendation and fined Grant Thornton. Relying or purporting to rely on the evidence introduced by Harry Potter, the OCC’s audit wizard, the Comptroller found that Grant Thornton participated in an unsafe or unsound practice by recklessly failing to comply with GAAS in planning and conducting the Keystone audit. In a cease and desist order, the Comptroller limited Grant Thornton’s freedom to accept and conduct audits independently, hire accountants, and handle working papers.
Grant Thornton attacks the Comptroller’s decision and orders on multiple grounds. We need address only one. We find that the Comptroller exceeded his statutory authority in characterizing Grant Thornton’s external auditing activity as “participating] in ... [an] unsafe or unsound [banking] practice,” see § 1813(u)(4), and as “engaging ... in an unsafe or unsound practice in conducting [Keystone’s] business,” see § 1818(b)(1), and in “conducting [Keystone’s] affairs,” see § 1818(i)(2)(B)(i)(II). Those conclusions end the case.
We review the OCC’s interpretation of FIRREA and related statutory provisions de novo because multiple agencies besides the Comptroller administer the act, including the Board of Governors of the Federal Reserve Board, the Federal Deposit Insurance Corporation, and the Office of Thrift Supervision in the Treasury Department. See Proffitt v. FDIC, 200 F.3d 855, 863 n. 7 (D.C.Cir.2000); Rapaport v. Department of Treasury, 59 F.3d 212, 215-17 (D.C.Cir.1995); Wachtel v. Office of Thrift Supervision, 982 F.2d 581, 585 (D.C.Cir.1993) (“[§ 1818(b)] is ... also administered by the Federal Reserve Board, the Comptroller of the Currency, and the FDIC, and thus deference under Chevron ... is inappropriate.”); see also Collins v. NTSB, 351 F.3d 1246, 1253 (D.C.Cir.2003) (noting Congress’s observation that “more than one agency may be an appropriate Federal banking agency with respect to any given [type of banking] institution,” citing § 1813(q)).
The relevant statutory structure is unusual to say the least. It is a bit as if provisions penalizing theft started by defining a “thief’ as “a person who commits theft, to wit, one who intentionally takes away the property of another,” etc., and then imposed penalties on any “thief who intentionally takes away the property of another,” etc. The upshot obviously involves a good deal of linguistic duplication; and imposition of a penalty requires that the accused be shown both to fit the statutory definition and to have committed the acts actually triggering punishment.
Here the crucial definition is that of an “institution-affiliated party” (“IAP”), which includes
(4) any independent contractor (including any attorney, appraiser, or accountant) who knowingly or recklessly participates in—
(C) any unsafe or unsound practice, which caused or is likely to cause more than a minimal financial loss to or a significant adverse effect on, the insured depository institution.
12 U.S.C. § 1813(u)(4). We assume without deciding that an accounting firm like Grant Thornton can qualify as an independent contractor.
The relevant substantive provisions of FIRREA echo the definition. Under 12 U.S.C. § 1818(b)(1), the Comptroller of the *1332 Currency may issue a cease-and-desist order if a bank or IAP “is engaging or has engaged ... in an unsafe or unsound practice in conducting the business of [an] insured depository institution”; and under § 1818(i)(2)(B)(i)(II) the Comptroller may impose civil monetary penalties when a depository institution or IAP “recklessly engages in an unsafe or unsound practice in conducting the affairs of [an] insured depository institution” which causes a more than minimal loss to the bank or meets other aggravating circumstances.
While the definitional section doesn’t specify that the accused must have engaged in the “unsafe or unsound practice” in “conducting the business of the bank, § 1818(b)(1), or in “conducting the affairs of the bank, § 1818(i)(2)(B)(i)(II), the OCC doesn’t dispute that, to prevail under the substantive provisions, it must show that Grant Thornton’s audit activity amounted to such “conducting.” See OCC Br. at 4.
Nor does the Comptroller contest that the phrase “unsafe or unsound practices,” in all its appearances here, means “unsafe or unsound banking practices.” The latter is, indeed, the formulation that the Comptroller uses in his Notice of Assessment of a Civil Monetary Penalty, at 17-18 and his Final Decision and Order, at 17. That reading (besides being undisputed and according with conventional banking terminology) harmonizes the definitional section, § 1813(u)(4), with the two substantive sections penalizing one who recklessly participates or engages in “an unsafe or unsound practice in conducting the business” or “the affairs” of a depository institution. § 1818(b)(1), (i)(2)(B)(i)(II).
Although the OCC’s Notice of Charges for Issuance of an Order to Cease and Desist might be read as claiming that the “unsafe or unsound practice” in which Grant Thornton allegedly engaged was Keystone’s own fraud, see id. at 20, its final decision identified the practice as Grant Thornton’s conduct of the audit: “Clearly, Grant Thornton itself ‘participated’ in an unsafe or unsound practice when it violated GAAS in carrying out its audit.” Final Decision and Order, at 17; see also id. at 20. Thus, the Comptroller’s orders rest on the idea that recklessly conducting a non-GAAS audit of a bank constitutes participation in an unsafe or unsound practice in conducting the business or affairs of the bank. But however incompetently or recklessly the audit may have been performed, conduct of the audit cannot be shoehorned into the controlling statutory language.
First, Grant Thornton didn’t participate in an “unsafe or unsound [banking] practice” because an audit of the sort conducted here is not a banking practice. Grant Thornton was fulfilling the classic reporting function of external auditors — examining the company’s books from the outside and verifying the accuracy of its records and the adequacy of its internal controls. This sort of outside look into a bank’s activity is not a “practice” of a depository institution or bank. FIRREA defines a “depository institution” as “any bank or savings association.” § 1813(c)(1). It defines a “bank” as “any national bank and State bank, and any Federal branch and insured branch.” § 1813(a)(1)(A). As this definition is in part circular, itself depending on the meaning of the word “bank,” Congress evidently relied on common understanding to fill the gap. The language of Webster’s Third New International Dictionary (1981), identifying a bank as “an establishment for the custody, loan, exchange, or issue of money, for the extension of credit, and for facilitating the transmission of funds by drafts or bills of exchange,” id. at 172, seems apt. A review of a bank’s books is quite distinct from the *1333 “custody, loan, exchange, or issue ... of money” or “facilitating the transmission of funds.” Id. We do not attempt to define the full universe of activities that encompass “banking practices.” Yet we are certain that an external auditor whose sole role is to verify a bank’s books cannot be said to be engaging in a “banking practice.” We do not answer the question of whether an internal auditor with an equally limited role (if there be any such) is conducting the bank’s business.
In oral argument, Comptroller’s counsel advanced the idea that because § 1831m(f)(l) requires that banks, in order to stay in business, undergo GAAS-compli-ant audits on an annual basis, it follows that such audits are necessarily part of a bank’s business. See Oral Argument, 45:24-45:38; see also § 1831m(a)-(f). This seems to us a complete non-sequitur. That a bank must engage outsiders to perform services does not necessarily turn such providers into bankers. In the case of auditors, of course, the need to enlist their services comes in part from the law, in part from the practicalities of raising the bank’s own capital, but it is hard to see why the element of legal compulsion should change the matter. It makes as much sense to say that Grant Thornton was conducting Keystone’s business as it is to say that an Underwriters Laboratories representative who inspects a toaster is “engaged in conducting the manufacture of toasters,” or that a Department of Agriculture representative checking a smokehouse for compliance with meat safety laws is “engaged in conducting the operation of a smokehouse.”
Second, we have some assistance from the Supreme Court on the meaning of a phrase closely parallel to those in question here. In Reves v. Ernst & Young, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the Court construed the following language from RICO: “to conduct or participate, directly or indirectly, in the conduct of [an enterprise’s] affairs.” Id. at 177-79, 113 S.Ct. 1163 (discussing 18 U.S.C. § 1962(c)). Reasoning that Congress meant something broader than “conduct [the enterprise’s] affairs,” but narrower than merely “participate in [its] affairs,” the Court concluded that a covered party “must have some part in directing [the enterprise’s] affairs.” Id. at 179, 113 S.Ct. 1163. Grant Thornton played no such directive role in Keystone’s affairs.
A directing role can, of course, be a minor one. In Cavallari v. Office of Comptroller of the Currency, 57 F.3d 137, 140 — 41 (2d Cir.1995), the court affirmed the Comptroller’s classification of an attorney as an IAP because he provided oral and written advice to a bank that exchanging loan guaranties, resulting in the bank’s gaining an interest in a financially unsound company, was in the bank’s best interest. The court’s holding also rested on the fact that the lawyer drafted the paperwork needed to complete the transaction. Thus he advised the bank, in a forward-looking capacity, on how to conduct the bank’s own business — lending. By actively encouraging a dubious transaction, he played a part in conducting the bank’s business in a way that was “contrary to accepted standards for banking operations.” Id. at 143. In contrast, while Grant Thornton’s audit may have been “strikingly incompetent,” as described at length by the concurring opinion, it neither proffered advice on nor assumed any directive role in Keystone’s conduct of its affairs. The Comptroller nowhere suggests that Grant Thornton was in cahoots with Keystone’s fraudulent managers.
Judge Henderson’s concurrence describes our opinion as a “rejection” of accountant liability as an IAP under *1334 § 1818(b)(1) and § 1818(i)(2)(B)(i)(II). Op. of Henderson, J., at 1336. Insofar as she may suggest a categorical rejection, the description is wide of the mark. Our discussion above makes clear that an accountant who plays an active role in directing a bank’s unsafe or unsound practices, or its wrongful transactions, as the lawyer in Cavallari did, can be sanctioned as an IAP; he would then have actually participated in an unsafe or unsound practice in conducting the business or affairs of a bank.
The concurring opinion also invokes legislative history to cast doubt either on our interpretation of the relevant provisions, or possibly on our opinion’s non-existent categorical rejection of accountant liability. In any event, the proposed use of legislative history doesn’t work. First, the text of the statute is clear enough that resort to legislative history is unnecessary. See Claybrook v. Slater, 111 F.3d 904, 907 (D.C.Cir.1997) (“If statutory language is clear ... it is both unnecessary and inappropriate to track legislative history.”). Second, even if mining legislative history were necessary to interpret the provisions, the section of the House Report commenting directly on § 1813’s IAP definition unsurprisingly tracks the statute’s actual language. It notes that “[appraisers, accountants, and attorneys have participated in some of the serious misconduct in banks and thrift institutions.” H.R.Rep. No. 101-54(1), at 466 (1989), reprinted in 1989 U.S.C.C.A.N. 86, 262 (emphasis added); see also id. (stating that independent contractors are liable under the provisions “only if they participate in the conduct of the affairs of ... insured financial institutions”). Then it distinguishes between an attorney who provides a bank advice or services in good faith and an attorney who also “knowingly participates in other activities which result in serious misconduct,” saying that the former is not a target for enforcement action, whereas the latter is. Id. at 467, 1989 U.S.C.C.A.N. at 263.
Third, the legislative history cited in the concurring opinion, highlighting the role of “poor quality audit work” in the banking scandals of the late 1980s, appears in the preliminary, narrative sections of the House Report; it doesn’t specifically comment on particular provisions of FIRREA, let alone any part of §§ 1813 or 1818. Id. at 300-01, 1989 U.S.C.C.A.N. at 96-97. Nothing links Congress’s apparent concern that poor auditing “delayed regulatory action” and thus “raised the ... cost of resolving thrift failures” to the sections at issue here. Id. at 301, 1989 U.S.C.C.A.N. at 97. Certainly other provisions of FIR-REA seem responsive to this general concern. Some, for example, imposed stricter auditing requirements on banks and required banks to give the Comptroller access to “books, records, accounts, reports, files, and property ... used by ... an independent certified public accountant retained to audit” banks or their funds. 12 U.S.C. § 1827(d)(2); see also 12 U.S.C. § 1441a(k)(l)(B) (1989) (a FIRREA provision that contained language identical to that of § 1827(d)(2), though the language was removed in a 1991 amendment); FIR-REA, §§ 220, 501. And Congress’s commissioning of a feasibility report on means of enhancing transparency between audits and the bank regulatory agencies, id. § 1001, 12 U.S.C § 1811 note, also appears aimed in part at reducing the risk of defective audits. In short, assigning the provisions in dispute their ordinary-language meanings creates no inconsistency with the House Report.
Finally, we note that Congress has given the Comptroller wide latitude to punish accountants who transgress GAAS in their audits of depository institutions:
*1335 In addition to any authority contained in [12 U.S.C. § 1818], the Corporation or an appropriate Federal banking agency may remove, suspend, or bar an independent public accountant, upon showing of good cause, from performing audit services required by this section.
12 U.S.C. § 1831m(g)(4)(A). While Congress added this provision after adoption of FIRREA (as part of the Federal Deposit Insurance Corporation Improvement Act, Pub.L. No. 102-242, § 36, 105 Stat. 2236, 2244 (1991)), its presence makes clear that giving the words of FIRREA their ordinary meaning leaves the banking authorities ample power to sanction delinquent auditors. Here, of course, we need not address the application of § 1831m(g)(4)(A) to Grant Thornton, as the Comptroller has not tried to rest its case on that section.
We vacate the Comptroller’s final decision and orders for the reasons stated.

So ordered.