KAREN LECRAFT HENDERSON, Circuit Judge,
concurring in the judgment:
I agree with my colleagues that we should vacate the civil monetary penalty and cease and desist order the Office of the Comptroller of the Currency (OCC) imposed on Grant Thornton; however, I am not persuaded by their reasoning and therefore concur in the judgment only. The Congress enacted the Financial Institution Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. 101-73, 103 Stat. 183 (1989), as a direct response to the savings and loan crisis of the late 1980s. See H.R. Rep. No 101-54, at 291-92 (1989), as reprinted in 1989 U.S.C.C.A.N. 87. The House Banking, Finance and Urban Affairs Committee Report (House Report) accompanying the legislation discusses the causes of that crisis. Among them, the Report highlights “poor quality audit work” as one of the primary ones. The House Report explains:
The public accounting industry and certified public accountants (CPAs) played a major role in masking the insolvency of many failed thrifts, and often did not report fraud and insider abuse by thrift managements to thrift regulators. In a study of failed S & L’s [sic] under the supervision of the Federal Home Loan Bank of Dallas, the GAO reported,
For six of the eleven failed S & L’s [sic] we reviewed, CPA’s [sic] did not adequately audit or report the S & L’s financial condition or internal control problems in accordance with professional standards.
Independent audits are an integral part of the system of controls designed to identify and report problems in thrift’s [sic] when they arise. A lack of professionalism and poor quality audit work by CPA’s [sic] helped mask the presence of fraud at a number of failed thrifts. In many instances auditors did not notify regulators about poor management practices at failing thrifts, which ultimately delayed regulatory action against many unscrupulous thrift managements. This delay has significantly raised the ... cost of resolving thrift failures.
Id. at 301, 1989 U.S.C.C.A.N. at 97. In light of the Congress’s express conclusion that “poor quality audit work” played a large role in causing the savings and loan crisis, which crisis produced FIRREA, I cannot join in the majority’s holding that “when an accounting firm merely performs an external audit aimed solely at verifying the accuracy of a bank’s books, it is not ‘participating]’ or ‘engaging’ in ‘an unsafe or unsound practice in conducting the busi *1336 ness’ or ‘the affairs’ of the bank as those terms are used in 12 U.S.C. §§ 1813(u)(4)(C), 1818(b)(1), and 1818(i)(2)(B)(i)(II).” Maj. Op. at 1329. As the majority itself notes, the statutory interplay among these subsections is “unusual to say the least” and “obviously involves a good deal of linguistic duplication.” Maj. Op. at 1331. But 12 U.S.C. § 1818(b)(1) and 12 U.S.C. § 1818(i)(2)(B)(i)(II) expressly include an Institution Affiliated Party (IAP) within their respective sanctions so that there must be some way in which an IAP accountant “participates” or “engage[s]” in “an unsafe or unsound practice in [the] eonduct[ ]” of the “business”/“affairs” of a bank. The Second Circuit has decided as much with regard to an IAP attorney. Cavallari v. OCC, 57 F.3d 137, 142-43 (2d Cir.1995). Because an IAP accountant can be sanctioned under section 1818(b)(1) and section 1818(i)(2)(B)(i)(II), I believe that the majority’s rejection of such a result here is wrong.
The OCC’s sanctions levied against Grant Thornton should nonetheless be vacated. The same House Report makes clear that the Congress did not intend FIRREA to be used to levy a firm-wide penalty against an IAP unless “most or many of the managing partners or senior officers of the entity have participated in some way in the egregious misconduct.” H.R.Rep. No. 101-54, at 467, 1989 U.S.C.C.A.N. at 263. During the hearings before the House Banking, Finance and Urban Affairs Committee (Committee), several organizations, including the American Institute of Certified Public Accountants and the American Bar Association’s Business Law Section, expressed
[e]oncern ... that [the OCC] could obtain enforcement orders against a corporation, firm, or partnership, such as a large accounting, appraisal, or law firm, since the term “person” includes entities as well as individuals, and that therefore enforcement orders would not be limited to those individuals who may have been responsible for the wrongful action.
Id. at 466-67, 1989 U.S.C.C.A.N. at 262-63. In response, the Committee explained:
[T]he Committee expects the [OCC] to limit enforcement actions in the usual case to individuals who have participated in the wrongful action, to prevent unintended consequences or economic harm to innocent third parties.
However the Committee strongly believes that [OCC] should have the power to proceed against such entities if most or many of the managing partners or senior officers of the entity have participated in some way in the egregious misconduct. For example, a removal and prohibition order might be justified against the local office of a national accounting firm if it could be shown that a majority of the managing partners or senior supervisory staff participated directly or indirectly in the serious misconduct to an extent sufficient to give rise to an order. Such an order might well be inappropriate if it was taken against the entire national firm or other geographic units of the firm, unless the headquarters or these units were shown to have also participated, even if only in a reviewing capacity.
Id. at 467, 1989 U.S.C.C.A.N. at 263 (emphases added).[1] At the time of the *1337 Keystone audit, Grant Thornton had approximately 300 partners and 3,500 other employees in 40 offices throughout the United States. Hr’g Tr. 2160, Nov. 23, 2004. The failure of Grant Thornton’s Keystone audit, however, was caused by the actions of only two individuals. The OCC made no finding that the flaws in the Keystone audit resulted from any systemic problem within Grant Thornton. Nor is there any evidence in the record that “most or many of the managing partners or senior officers of [Grant Thornton] ... participated ... in the egregious misconduct” which produced the deficient audit. See H.R.Rep. No. 101-54, at 467, 1989 U.S.C.C.A.N. at 263. Therefore, I agree that the sanctions against Grant Thornton should be vacated.
I also firmly disagree with the majority’s vacillating assessment of the audit Grant Thornton conducted. See Maj. Op. at 1333 (“while Grant Thornton’s audit may have been ‘strikingly incompetent,’ ...” (emphasis added)). A fuller exposition of the facts will prove my point: The First National Bank of Keystone (Keystone) had operated for years as a small, community bank in Keystone, West Virginia. In the early 1990s, however, Keystone changed its business focus and became heavily involved in the business of purchasing and securitizing sub-prime mortgages. Its new business, so it appeared, increased the value of its loan portfolio from $100 million in 1992 to over $1 billion by 1997. Reality was much different — Keystone was losing money as it was being looted by its management. To preserve the illusion of profitability, Keystone’s management fraudulently misrepresented its financial condition. At the center of the fraud was a business arrangement Keystone entered into with United National Bank (United) of Wheeling, West Virginia. Under the arrangement Keystone was to act as a mortgage purchasing agent for United. Keystone canvassed the market for available mortgages and notified United on a daily basis of its findings. When suitable mortgages were available, United provided Keystone with the funds to purchase the mortgages on United’s behalf. Keystone then arranged for two outside firms, Compu-Link and Advanta, to service the mortgages for United while the mortgages were prepared for securitization.[2] After purchasing the mortgages with funds provided by United and arranging for servicing and securitization, Keystone included the mortgages on its books as assets despite the fact that United owned them. See OCC Dec. at 4-5.
During the 1990s, the OCC repeatedly investigated Keystone. The investigations never uncovered the full extent of the Keystone fraud; however, they did reveal irregularities in Keystone’s management and accounting practices reflected in the quarterly reports Keystone was required to file with the OCC. On May 8, 1998 the OCC informed Keystone that it was considering imposing a civil monetary penalty after Keystone filed an inaccurate report for the third quarter of 1997; however, Keystone forestalled the penalty by entering into a formal Supervisory Agreement with the OCC which required Keystone to strengthen internal accounting controls *1338 and retain a national accounting firm to “audit the bank and correct the accounting and internal control deficiencies” the OCC had noted during its earlier examinations of Keystone. OCC Dee., Findings of Fact (FF) 133.[3]
In July 1998, Keystone hired Grant Thornton to perform the required audit. Before performing any work, Grant Thornton representatives attended a meeting between the OCC and Keystone to discuss the OCC’s earlier investigations of Keystone. The OCC representatives explained that Keystone had overstated its assets by about $90 million (almost 10% of its reported assets) in three earlier quarterly reports. Grant Thornton assigned one partner, Stanley Quay, and one associate, Susan Buenger, — both from its Cincinnati office — to perform the Keystone audit.[4] During the pre-audit planning the two became aware of several additional facts manifesting that the Keystone audit required heightened scrutiny, to wit:
(1) in a short period of time Keystone had grown rapidly in asset size and profitability (FF 82, 83); (2) Keystone was heavily involved in significant and complex securitizations (FF 82-114); Keystone faced significant liquidity risk (FF 148, 149, 167); (4) Keystone was troubled and undercapitalized (FF 135, 167); (5) Grant Thornton had been retained by Keystone in order to comply with the OCC Formal Agreement that required the bank to retain an external auditor to resolve the bank’s accounting inaceura-cies and deficiencies and to establish an internal control structure (FF 132-134); (6) The OCC had just downgraded the bank to an unacceptable composite “4” CAMELS rating, and downgraded Keystone’s management to the lowest rating of “5” (FF 150); (7) the FBI had investigated [Keystone’s “senior vice president” and “controlling officer”] Ms. Church with respect to illegal “kickbacks” related to the bank’s residential lending (FF 171); (8) Mr. Michael Graham, a vice president of KMC [Keystone Management Company (a Keystone subsidiary)], was cited by the OCC as being responsible for an unexplained $31 million “input error” in the bank’s accounting for residual assets (FF 139); (9) Keystone recently had recorded ownership of $44 million in trust accounts even though they were not Keystone assets (FF 139); (10) Keystone also recently had claimed ownership of $16 million in residual interests in securitizations even though Keystone had pledged those interests to other parties (FF 139); (11) the bank had a history of filing inaccurate Call Reports, key insiders had been assessed CMPs [civil monetary penalties] in connection with those inaccuracies, and the OCC was considering additional CMPs against these same insiders (FF 151); and (12) the OCC examiners had accused Ms. Church of manipulating Call Reports so that the bank’s “well capitalized” status under FDICIA [the Federal Deposit Insurance Corporation *1339 Improvement Act] continued to be reported even though inaccurate (FF 140).
OCC Dec. 10-11. Despite these obvious red flags, Quay and Buenger began with what Grant Thornton’s audit manual termed a “Basic” audit. FF 176-77, 182-83. Performing only a “Basic” audit, Quay and Buenger were to (1) obtain written confirmation from Compu-Link and Ad-vanta that they were in fact servicing the loans Keystone had reported on its balance sheet and (2) verify Keystone’s claimed $98 million in interest income for the year 1998.[5] The original Keystone audit plan called only for a “test of reasonableness.” OCC Dec. 38. At some point after the audit plan was prepared, however, a Grant Thornton supervisor in a different local office reviewed the plan and determined that Keystone should be classified “maximum risk.” See FF 184, 186, 188. According to Grant Thornton’s audit manual, in auditing a maximum risk client, an auditor is required to perform a “Comprehensive” audit, including a “test of details” to verify the accuracy of the client’s interest income. FF 185-89. Despite Keystone’s classification as “maximum risk,” the original audit plan was not amended and Quay and Buenger proceeded with the “Basic” audit.
At the commencement of the audit, Buenger attempted to independently verify the size of Keystone’s mortgage portfolio. Keystone’s records indicated that, as of December 31, 1998, Compu-Link and Advanta had serviced Keystone-owned accounts worth, according to Keystone, approximately $227.2 million and $242.6 million respectively. In reality, however, Compu-Link had serviced approximately $14 million in Keystone accounts and Ad-vanta had serviced approximately $6.3 million. Buenger asked Compu-Link and Advanta in writing to verify the size of Keystone’s loan portfolios. CompuLink verified, without explanation, that it had serviced just over $227 million “of Keystone loans.”[6]
After receiving no response from Advan-ta for several weeks, Buenger followed up by telephone and fax. The Advanta manager in charge of the Keystone accounts, Patricia Ramirez, then sent Buenger a statement via FedEx indicating that Ad-vanta had serviced only approximately $6.3 million in Keystone mortgages in 1998 — a figure less than 1/38 of the $242 million Keystone reported.[7] Several weeks later Buenger again telephoned Ramirez. Ramirez told Buenger that she had located another pool of “Keystone” mortgages worth approximately $236 million. Immediately after the call, however, Ramirez emailed Buenger stating that the $236 million in mortgages were owned by “Investor # 406,” identified in the email as “United National Bank.” Notwithstanding the ti *1340 tanic discrepancy, Buenger did not request a written clarification as required under Generally Accepted Auditing Standards (GAAS).[8] Instead, relying on the earlier telephone call with Ramirez, Buen-ger simply concluded that the $242 million figure was accurate.
This was only the most eye-popping deficiency in the Keystone audit. Despite Keystone’s classification as “maximum risk,” Quay and Buenger used only the “test of reasonableness” to verify Keystone’s self-reported interest income figures. Their test of “reasonableness” was based on fraudulent financial information Buenger obtained directly from Keystone. They made no effort to independently verify the accuracy of the figures as they were required to do under GAAS and Grant Thornton’s own internal audit manual.[9] In reality almost the entire $98 million that Keystone reported in interest income for 1998 did not exist — a fact that could have quickly been verified by requesting the monthly remittances Keystone received from its loan servicers.[10] See FF 220-27. Nor does it appear that the auditors confirmed that any of the reported interest income was in fact deposited in Keystone’s account by reviewing Keystone’s general ledger. Compare Tr. 2502-10, Nov. 24, 2004 with FF 257.
Having failed to detect the Keystone fraud, Grant Thornton issued an unqualified audit opinion in April 1999 confirming that “the audit had been conducted pursuant to GAAS and that Grant Thornton had *1341 obtained reasonable assurance that the bank’s financial statements were free from material misstatements.” FF 253. Only four months later, however — in August 1999 — OCC examiners discovered that Keystone had fraudulently reported over $98 million in interest income, FF 259, and over $450 million in assets (approximately 50% of the total assets reported by Keystone), id., and was “hopelessly insolvent,” OCC Dec. 1. In September 1999, OCC ordered Keystone closed and appointed the Federal Deposit Insurance Corporation (FDIC) as receiver. The Keystone collapse cost the FDIC approximately $600 million to resolve.[11] Tr. 351, Nov. 12, 2004.
The conduct of the two Grant Thornton auditors can only be described as strikingly incompetent. They failed to comply with GAAS as required under 12 U.S.C. § 1831m(f)(l). They failed to assess, in Grant Thornton’s own words, the “maximum risk” Keystone represented. They relied upon a telephone conversation regarding the loan amount Advanta had serviced despite the fact that Advanta advised them in writing at least twice that Advanta had serviced only a fraction of the amount of loans Keystone’s records showed. They failed to amend their audit plan to require a “test of details” — in violation of Grant Thornton’s own manual — after Keystone was classified a “maximum risk” audit.
Accountants and auditors perform a critical role in insuring the integrity of financial institutions. See H.R.Rep. No. 101-54, at 301 (“Independent audits are an integral part of the system of controls designed to identify and report problems in thrift’s [sic] when they arise.”). Although I recognize that “[a]uditors do not function as insurers and their reports do not constitute a guarantee,” OCC Dec. 2, nonetheless “bank regulators, the bank’s shareholders and the public,” id., expect to rely on an auditor’s professional competence and deserve better than what happened here.

. The OCC argues that this language limiting firm-wide liability applies only to "12 U.S.C. § 1818(e)'s removal and prohibition sanctions against professional firms.... There was no hint in the House Report that professional firms were not subject to [other] enforcement actions or that it would be inappropriate to impose non-prohibition remedial actions and *1337 [civil monetary penalties] against professional firms acting as IAPs.” OCC’s Br. 33. Not so. The House Report makes clear that the discussion of removal and prohibition sanctions is offered as simply one example of the "special” circumstances under which firm-wide liability might be applied. See H.R.Rep. No. 101-54(1), at 467, 1989 U.S.C.C.A.N. at 263.

. In 1998 alone, Keystone purchased over $960 million in mortgages for United.

. The Supervisory Agreement required that Keystone retain a national accounting firm to, inter alia,
(1) “perform an audit of the Bank’s mortgage banking operations and determine the appropriateness of the Bank's accounting for purchased loans and all securitiza-tions”;
(2) reconcile Keystone’s records and loan servicer records; and
(3)assess the appropriateness of all carrying values of entries on the balance sheet and income statement.
FF 133 (quoting OCC Ex. 353) (internal citations omitted).

. At that time Quay had worked on over 600 financial institution audits. Tr. 2159, Nov. 23, 2004. Buenger had over four years of auditing experience with Grant Thornton. See Tr. 2590, Nov. 24, 2004.

.Interest income can be verified in at least two different ways. See OCC Dec. 27-28 (discussing tests). The first method, a "test of reasonableness,” requires only that the auditor examine the bank’s self-reported figures and evaluate their reasonableness based on "expected relationships” with other information in the bank's financial statements. See FF 66-68, 180. The more searching method, a "test of details,” requires the auditor to review the bank’s "primary financial documents such as ... remittances and cash receipts” and to "trace! ] those items into bank records.” FF 63-65.

. The Administrative Law Judge suggested that the reason for the discrepancy was that Keystone management influenced Compu-Link to pool the Keystone and United accounts when responding to Grant Thornton’s request. See ALJ Dec. 9-10.

. Most of the mortgages were "high-loan-to value ... second and third mortgage loans.” FF 83.

. The American Institute of Certified Public Accountants (AICPA) adopted Generally Accepted Auditing Standards to govern the performance of a financial audit. See Ferriso v. NLRB, 125 F.3d 865, 871 (D.C.Cir.1997). Under 12 U.S.C. § 1831m(f)(l) an auditor examining a federally insured depository institution is required to comply with GAAS. GAAS requires, inter alia, that an auditor exercise "due professional care” and "professional skepticism” in conducting an audit. See GAAS § .02 (2007); AICPA, Codification of Statements on Auditing Standards (AU) § 230.07 (2007). GAAS also specifies that “[w]henever the auditor has concluded that there is significant risk of material misstatement ... of the financial statements ... more experienced personnel!,] more extensive supervision [or] ... expanded] ... [auditing] procedures” may be required. See AU § 312A.17. GAAS also requires that all "significant” confirmations of financial data be obtained in writing. See AU § 330.29. Buen-ger’s reliance on her telephone conversation with Ramirez that Ramirez had located an additional $236 million in "Keystone loans” flagrantly violated the requirement that all "significant” confirmations of financial data be in writing.

. See, e.g., FF 225 ("Grant Thornton did not follow the requirements of its audit manual to conduct a 'Comprehensive' audit that called for primary reliance upon a 'test of details’ in connection with the audit of interest income from loans serviced by third-party servi-cers.”); FF 230 ("Before an analytical test could be used for substantive purposes in place of a 'test of details,’ GAAS, as described in Grant Thornton's auditing manual, required Grant Thornton's auditors to identify and describe the internal controls pertinent to the assertions to be audited, test the controls to be relied upon, and re-evaluate such controls in light of the results to determine if reliance would be warranted.”); FF 232 ("Where an entity’s internal controls have not been tested for reliability, GAAS imposes a duty upon the auditor to independently verify all financial data generated internally or otherwise provided by the client's management before that data may be used for auditing purposes.”); see also FF 166, 179, 185-86, 233-36.

.Had Quay and Buenger applied a "test of details” instead of a "test of reasonableness,” they would have almost certainly detected the Keystone fraud. When, some months after the Grant Thornton audit, the OCC learned from Compu-Link and Advanta that Keystone’s mortgage portfolios were grossly overstated, the OCC contacted Grant Thornton. Grant Thornton performed a "test of details” and uncovered the fraud in under one hour. See OCC. Dec. 30 (citing FF 226).

. Recent litigation in the District of West Virginia resulted in the entry of a $25 million judgment against Grant Thornton for losses that " ‘but for’ Grant Thornton’s gross negligence, the FDIC would have avoided.” Grant Thornton LLP v. FDIC, Nos. 1:00-0655 et al., 2007 U.S. Dist. LEXIS 19379, at *100 (D.W.Va. Mar. 14, 2007).